E. M. GAMMELGARD VIRGIL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Virgil v. Commissioner
Docket No. 16384-81.
United States Tax Court
T.C. Memo 1983-757; 1983 Tax Ct. Memo LEXIS 32; 47 T.C.M. (CCH) 692; T.C.M. (RIA) 83757; December 19, 1983. James K. Norman, for the petitioner. Theodore Garelis, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent determined a deficiency of $6,778 in petitioner's income tax for 1977. At issue is whether partnership income reported by two children of petitioner should be reallocated to petitioner. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner resided in California when the petition in this case was filed. Petitioner married *33 Timothy Gammelgard on April 24, 1965. One child was born of the marriage, Jennifer Lynn Gammelgard (a.k.a Jennifer L. Virgil, a.k.a. J. L. Virgil, a.k.a. J. L. Gammelgard Virgil) (hereinafter Jennifer). Jennifer was born on October 18, 1966. Petitioner and Timothy Gammelgard were divorced on October 16, 1972. A son, Matthew Elon Harmon (a.k.a. Matthew E. Virgil, a.k.a. M. E. Virgil) (hereinafter Matthew) was born to petitioner on December 20, 1975. Matthew's father is Martin A. Harmon (hereinafter Martin). Martin and petitioner lived together at the time of the trial of this case, but have never been married to each other. John P. Casper (hereinafter Casper) is an attorney occasionally employed by Martin. In 1976 Casper met Ronald Meyers (hereinafter Ronald) who was attempting to develop a 126-acre parcel of land into 31 residential lots. Ronald informed Casper that $80,000 was needed to acquire the land and begin the development. Casper approached Martin to determine if he was interested in investing in the project. Martin was not interested in investing personally, but suggested that petitioner, Jennifer and Matthew might be interested in investing. Martin eventually *34 agreed upon certain conditions to lend [1] money to petitioner, Jennifer and Matthew to enable them to invest. The conditions of Martin's involvement as a lendor were that Casper would participate in the project as a principal, and that Martin would be given an option to acquire, at the developers' price, a choice lot in the development. Martin also agreed to lend money to Casper to enable him to invest in the project, and asked Casper to prepare notes to memorialize these various loans. Casper supplied three standard form promissory notes which were prepared to read, in pertinent part, as follows: for value received,      [2] promise to pay to Martin A. Harmon, or order, at Auburn, California, the sum of Twelve Thousand Five Hundred Sixty Six and 00/100 dollars in lawful money of the United States of America, with interest thereon, payable in like lawful money, at the rate of ten (10) percent per annum from date until paid. The notes were dated June 1, 1976, and were shown as due in June 1978, or on demand. The notes were *35 signed, respectively, M. E. Virgil, E. M. Virgil, and J. L. Virgil. Petitioner and Jennifer signed their respective notes, but Matthew, age six months, was unable to sign, and petitioner signed his name to the note in question. In furtherance of the above-described plan, articles of partnership were drawn up, providing, in pertinent part, as follows: ARTICLES OF PARTNERSHIP
JAMES RONALD MEYERS of Sacramento County, California, E. M. Virgil, M. E. Virgil and J. L. Virgil of Placer County, California, and JOHN P. CASPER, of Placer County, California, voluntarily associate themselves together as General Partners pursuant to the terms and conditions set forth in these Articles of Partnership. ARTICLE 1. NATURE OF PARTNERSHIP Type of Business
1.01 The Partnership shall engage in the general business of investing in real property and such activities as may be incidental thereto, and such other related businesses as may be agreed on by the Partners. Name of Partnership
1.02 The name of the Partnership shall be AUBURN INVESTORS. Term of Partnership
*36 1.03 The Partnership shall commence on June 1, 1976, and shall continue for a period of years unless sooner terminated as herein provided. * * * Duties of the Partners
1.05 JAMES RONALD MEYERS shall immediately after close of escrow start construction of roads, waterways and ponds. He shall further insure completion of engineering and surveying of all the lots contained in the subdivision. Further he shall diligently pursue and complete all matters with state or local government officials and obtain all reports or documents needed to insure the immediate sale of lots within the subdivision. It is expected that all roads will be completed within thirty days after close of escrow. 1.06 JOHN P. CASPER will insure the development of said subdivision continues at a rapid rate and will use his best efforts to obtain all documents so that sales of lots can be started immediately. 1.07 E. M. VIRGIL, M. E. VIRGIL and J. L. VIRGIL will have no duties or responsibilities to develop the subdivision. ARTICLE 2.FINANCIAL Initial Capital
2.01 Capital shall be contributed as follows: 1. Said Partnership will be purchasing approximately 132+/- acres in Placer County, *37 more particularly described in Escrow #2532 Placer Title Company, Auburn, California. 2. To close said escrow and complete the purchase of said real property, E. M. VIRGIL, M. E. VIRGIL and J. L. VIRGIL will deposit an approximate sum of       in said escrow account. 3. JAMES RONALD MEYERS shall be credited       for funds deposited in the escrow account. Further, all funds expended by said Partner in the development of said property shall be credited to his capital account. (Roads, engineering, ponds, and etc.) 4. JOHN P. CASPER shall make a $10,000.00 contribution to the initial capital of the Partnership and shall devote time and attention to the Partnership business and shall be entitled to a 10 percent share of the net profits of the Partnership. Books of Account
2.02 Complete and accurate accounts of all transactions of the Partnership shall be kept in proper books, and each Partner shall enter, or cause to be entered therein a full and accurate account of all his transactions of behalf of the Partnership. Inspection of Books
2.03 The books of account and other records of the Partnership shall, at all times, be kept in the principal place of *38 business of the Partnership, and each of the Partners shall, at all times, have access to, and may inspect and copy, any of them. Income Accounts
2.04 An individual income account shall be maintained for each Partner. At the end of each fiscal year each Partner's share of the net profits or net losses of the Partnership shall be credited or debited to and his withdrawals during such fiscal year deducted from his income account. After such amounts have been credited or debited to and deducted from a Partner's income account, any balance or deficit remaining in such account shall be transferred to or charged against such partner's capital account.
* * * Profits and Losses
2.10 The net profits or net losses of the Partnership shall be credited or charged, as the case may be, to the Partners in the following proportions: JAMES RONALD MEYERS 45%; E. M. VIRGIL 15%; M. E. VIRGIL 15%; J. L. VIRGIL 15%; and JOHN P. CASPER 10%. Capital Accounts
2.11 An individual capital account shall be maintained for each Partner consisting of his contribution to the initial capital of the Partnership, any additional contributions to the Partnership capital made by him pursuant to *39 these Articles, and any amounts transferred from his income account to his capital account pursuant to these Articles.
Partnership Profits
2.12 Profits shall be distributed to each Partner according to his Partnership interest. The Partnership interests are as follows: JAMES RONALD MEYERS
45%
E. M. VIRGIL
15%
M. E. VIRGIL
15%
J. L. VIRGIL
15%
JOHN P. CAPSER
10%
2.13 The first distribution of said profits shall be an amount equal to the capital contribution of each Partner as reflected on the books of the Partnership and in proportions thereto. It shall also include interest on said capital contribution at the rate of 9 percent per annum. 2.14 After said first distribution, the profits shall be adjusted and distributed to the Partners to reflect their respective Partnership interest. Power to Incur Liabilities
2.15 Each Partner shall have authority to bind the Partnership in making contracts and incurring obligations in the name and on the credit of the firm in the ordinary course of the Partnership business. No Partner, however, shall incur any obligation in the name or on the credit of the Partnership exceeding the sum of $100.00 without *40 the consent of one other Partner. Any Partner who incurs any obligation in the name and on the credit of the firm in violation of this provision may be held individually liable by the other Partners for the entire amount of the obligation thus incurred. The limitation on the amount of an obligation that may be incurred by any Partner contained in this paragraph may be increased or decreased at any time by agreement of all Partners. * * * Prohibited Acts
2.17 No Partner shall, without the consent of all other Partners: 1. Loan any Partnership funds; 2. Extend Partnership credit to any person a Partner has notified the Partnership not to trust; 3. Incur any obligations in the name or on the credit of the Partnership except in the ordinary course of the Partnership business; 4. Become bail, surety, or indorser for any other person. In a memorandum agreement dated June 1, 1976, Auburn Investors memorialized an agreement with James J. Brennan, III, whereby the former was to buy, and the latter sell, certain real property located in Placer County, California. On June 1, 1976, Martin drew a check to the order of Casper in the amount of $10,000. On that same day *41 Casper deposited that check in an escrow account with the Placer Title Company, to be used in purchasing the Placer County property. This sum was a loan from Martin to Casper to enable Casper to invest in Auburn Investors. Also on June 1, 1976, Martin drew a check to the order of Placer Title in the amount of $56,913.26 to be used in purchasing the Placer County property. This amount included the funds Martin was to loan to petitioner, Matthew and Jennifer, totaling $37,698, and funds to exercise Martin's option to acquire a lot located on the Placer County property. Also on June 1, 1976, Auburn Investors signed a promissory note obliging itself to pay $331,480 plus interest of 8.5 percent per annum under certain terms to James J. Brennan, III. This note was delivered to Placer Title Company. On June 24, 1976, a deed of trust was recorded in Placer County, California, in which Auburn Investors granted to James J. Brennan, III, a security interest in the Placer County property. The preparation and execution of the aforementioned documents was supervised by Casper, all within a two-week period, and under great time pressure. Casper did not meet petitioner, Matthew or *42 Jennifer while he was preparing the aforementioned documents, or during his tenure as a partner in Auburn Investors. In early 1977 Ronald Meyers asked to be bought out of Auburn Investors. Casper thereupon prepared a document captioned "Modification of Partnership Agreement," which reads as follows: On June 1, 1976 the undersigned parties formed a General Partnership known as Auburn Investors. The purpose of this Modification Agreement is to alter the duties and responsibilities of the partners. 1. E. M. Virgil, M. E. Virgil and J. L. Virgil hereafter will be liable for all expenses incurred in developing Kingmont Subdivision.Each of said partners agree to complete the improvements in an expedient and business-like manner. 2. James Ronald Meyers is hereby relieved of his duty to oversee the project and agrees to reduce his interest in the partnership from 45% to 20% upon the following conditions: 1) Payment of $15,000.00 upon execution of this document. 2) Payment of $10,000.00 on or before January 1, 1978. 3) Payment of $11,250.00 on or before March 1, 1978. 4) Payment of $11,250.00 on or before June 1, 1978. 5) Balance on March 1, 1979. It is understood *43 that this schedule of payments is based on anticipated lot sales of Kingmont Subdivision. If lot sales increase and the subdivision is sold out sooner, then the above payment dates will increase accordingly. If Partnership funds not available, the payment schedule except for 1 and 2 will be decreased accordingly. It is further agreed that if the directing partners, using good business judgment, decided to expend funds on the construction of a speculative home on parcel 19, then James Ronald Meyers agrees that the lot so used will be discounted 15% from current market price.
It is further agreed that if the subdivision is sold within 18 months that James Ronald Meyers is entitled to interest at 9% per annum on the remaining $10,000 of his cash investment for the period of eight months or $600.00. * * * This agreement is predicated upon the factual presentation of bills due and owing on April 12, 1977. Should any further bills arise which were not taken into consideration by the parties, they shall reduce the profit of James Ronald Meyers.
Dated:      , 1977. /S/ E. M. Virgil E. M. Virgil /S/ M. E. Virgil M. E. Virgil /S/ J. L. Virgil J. L. Virgil /S/ *44 James Ronald Meyers James Ronald Meyers /S/ John P. Casper John P. Casper Pursuant to this agreement, $15,000 was paid to Ronald Meyers upon its execution. The source of this money was Martin, who loaned $5,500 each to petitioner, Matthew, and Jennifer. [3] These loans were memorialized by three notes, each in the amount of $5,500 and dated April 21, 1977, signed, respectively, by petitioner, Matthew (whose name was signed for him by petitioner), and Jennifer, and each providing for interest at 10 percent per annum. Petitioner drew a check in the amount of $15,000 payable to Ronald Meyers, dated April 20, 1977. As a result of the foregoing transaction it is contended that petitioner, Matthew and Jennifer each acquired part of Ronald Meyers' partnership interest in Auburn Investors. In each of its 1977 and 1978 tax returns, Auburn Investors listed separately the partnership interests of petitioner and her children. On its internal bookkeeping, however, Auburn Investors maintained only one account for petitioner and her children, *45 under the heading "Account Capital, E. M. Virgil, J. L. Virgil, M. E. Virgil." Between November 30, 1977 and February 26, 1979, Auburn Investors made various distributions from this account to petitioner and to Martin. Each distribution to petitioner from this account was made in the form of a single check payable to her, and was reflected by an appropriate reduction in the account of petitioner and the children. All such distributions received by petitioner were deposited by her in her personal checking account. Each distribution to Martin from this account was reflected by an appropriate reduction in the acount of petitioner and the children, and was credited by Martin in equal shares to amounts owed him by petitioner, Matthew and Jennifer. The following charts set out the distributions made by Auburn Investors up to February 26, 1979, to or on behalf of petitioner, Matthew and Jennifer: Date
Paid to
Amount
11/30/77
Petitioner
$ 600.00
6/9/77
Petitioner
1,750.00
7/6/78
Petitioner
10,000.00
8/4/78
Petitioner
15,000.00
9/13/78
Petitioner
2,000.00
Total:
$29,350.00
Date
Paid to
Amount
7/6/78
Martin
$ 1,500.000
8/31/78
Martin
20,000.00
2/1/79
Martin
23,000.00
2/26/79
Martin
4,207.09
Total:
$48,707.09
*46 These distributions were made by checks drawn on Auburn Investors' account and signed by Casper.In addition to distributions from Auburn Investors, the following amounts were deposited in petitioner's checking account: Date
Amount
Received from
4/20/77--
initial deposit
$50.00
Unknown
4/22/77
16,500.00
Martin
4/22/78
7,500.00
Martin
6/30/78
1,500.30
Martin
7/6/78
20.00
Unknown
Between April 20, 1977 and December 18, 1978, petitioner wrote 17 checks totaling $7,422.58, in payment of taxes on behalf of Matthew and Jennifer. During that same period petitioner wrote two checks totaling $23,000 to Martin. Two-thirds of each check written to Martin was credited by him to the accounts of Matthew and Jennifer. Petitioner thus wrote checks representing loan repayments to Martin or payments of tax obligations on behalf of Matthew and Jennifer in the total amount of $22,755.91. Debits totaling $54,707.35 were made to petitioner's checking account between April 20, 1977 and December 18, 1978. Of this amount, $22,755.91 represents loan and tax payments on behalf of Matthew and Jennifer, $10,400 represents investments in Auburn Investors on Matthew *47 and Jennifer's behalf, [4] and the rest represents amounts expended for personal expenses, investments, or legal obligations of petitioner. A total of $71,707.09 was paid to Martin by petitioner and Auburn Investors. The total amount advanced to petitioner, Matthew and Jennifer by Martin was $63,198, which amount included $10,500 deposited in petitioner's checking account but not contributed to Auburn Investors. Martin also charged interest totaling $8,009.09 on the loans to petitioner, Matthew and Jennifer memorialized by the above-described notes. The total amount advanced by Martin, plus interest thereon, was thus $71,207.09, and a total of $71,709.09 was paid to him by or on behalf of petitioner, Matthew and Jennifer. All the aforementioned notes to Martin in the names of petitioner, Matthew and Jennifer bear the notations "Paid in Full 2/28/79." OPINION Section 61 [5] provides that gross income means all income from whatever source derived, including a distributive share of partnership gross income. The parties agree *48 that Auburn Investors' 1977 gross income reported by it as distributive shares of petitioner, Matthew and Jennifer is includable in gross income; they disagree as to who must include such distributive shares in gross income. Petitioner contends that the purported partnership interests of Matthew and Jennifer should be respected, and that distributive shares attributable thereto should be included in the gross income of Matthew and Jennifer, respectively.Respondent contends that the purported distributive shares of Matthew and Jennifer should be included in the gross income of petitioner. It is well settled that when a parent gives (or, a fortiori, lends) property to his or her child in a bona fide transaction, the income from such property is taxable to the child. ; . [6] If trustees or guardians had been appointed to safeguard the *49 interests of Matthew and Jennifer in Auburn Investors, as was the case with the donee minor children in , and , there can be little doubt that their distributive shares of the gross income of Auburn Investors would be includable in their gross incomes, and no one else's. In the absence of such legal niceties, however, we must determine whether in substance the various documents described in our findings of fact transferred to Matthew and Jennifer interests in Auburn Investors which must be recognized for tax purposes. Petitioner contends that the various notes and partnership documents signed by or in the name of Jennifer and Matthew gave them rights enforceable under California law to distributive shares of Auburn Investors' gross *50 income, and further contends that, although no guardian or trustee was ever appointed to safeguard their interests, all parties to the various transactions involved in this case respected the partnership interests of Matthew and Jennifer. In support of their contention that the partnership interests of Matthew and Jennifer were respected, petitioner points out that between April 20, 1977 and November 28, 1978, Auburn Investors made total payments to petitioner on account of Matthew and Jennifer of $19,566.67, and that during this same period petitioner made disbursements in satisfaction of legal obligations of Matthew and Jennifer totaling $22,755.91. Thus, according to petitioner, none of the money distributed by Auburn Investors on the accounts of Matthew and Jennifer was ever used for the personal expenses or obligations of petitioner. In contending as she does, petitioner overlooks the fact that during the period in question Martin advanced $9,000 [7] to her account in addition to the amounts memorialized in the above-described notes. Auburn Investors repaid to Martin, either directly or through petitioner, not only the amounts he advanced to petitioner Matthew and Jennifer *51 reflected in the notes signed by them, but also the additional $9,000 advanced to petitioner. Since all such monies disbursed by Auburn Investors were accounted for by reducing the account captioned "Virgils' E.M. M.E. & J.L." it follows that $6,000 of the money used to repay the aforementioned $9,000 advance was attributable to the accounts of Matthew and Jennifer. Thus, the full amount disbursed with respect to the accounts of Matthew and Jennifer was $19,566.67 plus $6,000 for a total of $25,566.67. Only $22,755.91 was alleged by petitioner to have been spent on legal obligations of Matthew and Jennifer. Petitioner having failed to meet her burden of proving otherwise, Rule 142(a), we conclude that $2,810.76 which supposedly was gross income of Matthew and Jennifer was used to defray personal expenses or legal obligations of petitioner. Petitioner ahd Martin thus did not fully respect the purported rights of Matthew and Jennifer under the Auburn Investors' partnership agreement.
*52 Assuming, without deciding, that the various notes and the partnership agreement vested in Matthew and Jennifer enforceable rights under the laws of California to distributive shares of Auburn Investors' gross income in 1977, we do not believe that the interests of Matthew and Jennifer can be respected for tax purposes. Whatever the legal rights of Matthew and Jennifer, they were, respectively, one year and ten years old, and incapable of asserting their rights. Nor did anyone stand in the legal relationship of guardian or trustee to Matthew or Jennifer. [8] Whatever rights Matthew and Jennifer may have had in theory, there was, on the record before us, almost no likelihood that those rights would be enforced. [9] Given this, and the fact that in the years following the taxable year in issue petitioner ignored the rights of Matthew and Jennifer under the partnership agreement by appropriating their funds to pay her personal expenses, we conclude that the distributive shares credited by Auburn Investors to Matthew and Jennifer were actually under the control of petitioner.Accordingly, the distributive shares credited to the children's accounts in 1977 are taxable to petitioner. *53 [10]
Decision will be entered for the respondent.
Footnotes
1. We use the term "lend" in this context for ease of description, and without determining the legal significance of the events described.↩
2. The three notes contained the names, respectively, "M. E. Virgil," "E. M. Virgil," and "J. L. Virgil."↩
3. Payment was made by one check in the amount of $16,500, payable to petitioner, which she deposited in her checking account on April 22, 1977.↩
4. This amount includes two-thirds of the $15,000 paid to acquire Ronald Meyers' partnership interest, and two-thirds of $600 paid to Auburn Investors.↩
5. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
6. See also sec. 704(e), which provides that where capital is a material income producing factor of a family partnership, the family partnership interests will be recognized for tax purposes. "In the case of any partnership interest created by gift, the distributive share of the donee under the partnership agreement shall be including in his gross income * * *." Sec. 704(e)(2).↩
7. This sum represents the two checks dated 4/22/78 and 6/30/78 in the amounts of $7,500 and $1,500, respectively, received from Martin and deposited by petitioner in her personal checking account.↩
8. As pointed out by petitioners, it would have been a simple matter to have had legal guardians appointed for Matthew and Jennifer. Since Martin was advised by counsel throughout the various events pertinent to this case, we infer that the failure to provide legal guardians for Matthew and Jennifer was intentional, and we further infer that this omission was designed to allow petitioner to control the distributive shares nominally owned by Matthew and Jennifer. ↩
9. We do not believe that Casper has any incentive to protect the interests of Matthew and Jennifer, since Martin was the source of the funds Casper invested in Auburn Investors, as well as a client of Casper's. We note that during the period in question Casper had never met petitioner or her children. ↩
10. .↩